UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-30056-RGS

LANISHA RENEE DANIELS,
Appellant

v.

MICHAEL J. ASTRUE,
Commissioner of Social Security Administration

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

April 2, 2013

STEARNS, D.J.

Appellant Lanisha Renee Daniels seeks review of a final decision of the Commissioner of the Social Security Administration that she is not disabled within the meaning of the implementing regulations of the Social Security Act (Act). *See* 20 C.F.R. § 404.1520. The issue on appeal is whether the Administrative Law Judge (ALJ) erred in her determination that while Daniels was not able to perform her past relevant work, other jobs exist in significant numbers in the national economy that she can perform. The Appeals Council denied Daniels' request for review, thereby affirming the decision of the ALJ as that of the Commissioner. Daniels now seeks

review of the Commissioner's decision in this court as provided by 42 U.S.C. § 405(g).  The Commissioner, for his part, cross-moves for affirmance of the ALJ's decision.  A hearing on Daniels' appeal was held on March 27, 2013.

## BACKGROUND

Daniels applied for social security disability benefits (DIB) on June 18, 2009. The application was denied initially and upon reconsideration.  Daniels then requested a hearing before an ALJ.  On August 17, 2011, ALJ Addison C.S. Masengill heard testimony from Daniels and Michael Dorval, a vocational expert (VE).  The ALJ issued her decision, unfavorable to Daniels, on October 26, 2011.

Daniels was thirty-six-years old at the time of the hearing before the ALJ.  She has a ninth grade education and has worked primarily as a personal care assistant. She has not worked since November 24, 2008, the alleged onset date of her disability. She testified that at that time, issues relating to her daughter's ill-health "started to take effect on [her] life" and she became depressed. Tr. at 15.  Among her symptoms she listed feelings of sadness, constant worry, frequent crying, a nervous and shaky disposition, dislike of being in groups, and difficulty sleeping.  She indicated at the hearing that she has been in therapy since June of 2011, and that her primary care physician prescribes medication for depression, but that she has not been hospitalized for mental health issues.

2

Daniels also testified that she suffers from hernia pain and itchy skin. Daniels stated that her hernia "has a tendency to poke out," at times affecting her ability to stand and walk, and is aggravated by reaching overhead and lifting heavy objects. Tr. at 17. She indicated that it has been painful for many years and she had an appointment to be evaluated by a surgeon. For her skin problems Daniels has received steroid treatments.

Daniels acts as primary caregiver for her daughter. Daniels testified that she cooks, does laundry, and handles finances. She also stated that because of obsessive compulsive tendencies, she is constantly cleaning the house and insuring that everything is in its place. She does not have problems concentrating or staying focused, except when she watches television programs that do not interest her. She stated that she plays computer games for hours and listens to music, reads, and writes poetry and short stories.

Records from the Baystate Mason Square Neighborhood Health Center and other secondary treatment facilities covering the period February 5, 2008 through May 3, 2011, reveal that Daniels has a history of depression, allergic urticaria (a rare skin disease), and an umbilical hernia. When seen by medical staff on February 5, 2008, she complained of intermittent depression lasting many years and persistent insomnia. On January 28, 2009, she was treated by Dr. Sarah Workman after

experiencing two allergic reactions in two weeks. Dr. Workman noted during the visit that Daniels' mood and affect were within normal limits and she was not suffering from depression. Daniels again sought treatment for a rash and hives in July and August of 2009.

During visits for contraceptive injections in August and November of 2009, no signs of depression were noted. When seen on February 8, 2010, however, Daniels complained that she was feeling depressed and tearful with decreased energy. Treatment notes indicate that Daniels had stopped taking psychiatric medication and was no longer attending therapy. Dr. Le, the treating physician, prescribed another round of psychiatric medication and advised that therapy would be beneficial. Dr. Le also completed the paperwork for Daniels' disability application, opining that Daniels was unable to lift more than 25 pounds because of her hernia, but otherwise had no limitations.

In March of 2010, Daniels again reported that she felt depressed and complained of decreased energy, increased appetite, mood swings, irritability, and social isolation. She indicated that she had not taken the prescribed psychiatric medication because she was concerned about the potential side effects. When seen the following month, Daniels reported that she felt better at times. On August 31, 2010, Dr. Le determined that Daniels' hernia was stable and noted that Daniels

appeared well and in good spirits.  When Daniels returned to the Neighborhood Health Center in the spring of 2011, however, she complained of difficulties with short term memory, depression, and social and/or environmental stressors.  Dr. Le indicated that she would provide Daniels with a mental health contact.

On May 24, 2011, Daniels was screened at River Valley Counseling Center for an initial intake by Licensed Mental Health Counselor Catherine Gressler.  On a Mental Impairment Questionnaire (SSDP form) dated August 22, 2011, Gressler diagnosed Daniels with post-traumatic stress disorder (PTSD) and assigned her a Global Assessment Functioning (GAF)[1] score of 40, which indicates some impairment in reality perception or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood.  She estimated that Daniels would likely be absent from work more than four days per month as a result of her impairments.  Gressler noted in the SSDP form that she had had only two contacts with Daniels.

---

[1] The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults.  The higher the score, the better an individual is deemed able to cope in engaging in a wide range of activities.

Daniels also underwent a psychological consultative examination with independent medical examiner Leon Hutt, Ph.D., on November 3, 2009. Dr. Hutt found Daniels to be alert, oriented to time and place, and neatly groomed. He also noted that her affect was appropriate, although her mood was clearly depressed. Her speech, though clear, relevant, and coherent, was slow and contained certain oddities. She reported short-term memory impairment and dislike of being around groups. She complained that she suffered from insomnia, but also stated that she did not take her prescription sleep medication because it did not work for her. She further indicated that she had been prescribed various antidepressant medications, but had stopped taking them for the same reason.

Dr. Hutt diagnosed Daniels with PTSD and panic disorder with agoraphobia. He opined that she functioned in the low average range of adult intellectual functioning with a below average fund of knowledge. He assigned her a GAF score of 60, indicating either moderate symptoms or moderate difficulty in social, occupational, or school functioning. Dr. Hutt opined that Daniels could manage her own finances, but doubted that she could psychologically tolerate the stresses associated with full-time employment.

Finally, Daniels' case was reviewed by state agency medical consultants. On August 7, 2009, Dr. Erik Purins, a Disability Determination Service (DDS) staff

physician, determined that Daniels' skin condition was not severe and did not restrict her activity.  She had no severe skin lesions or systemic issues, and had responded well to her current treatment regimen.  On May 11, 2010, Dr. S. Lerman, also a state agency consultant, concurred with Dr. Purins' assessment as written.

On November 11, 2009, Dr. Jon Perlman, a DDS reviewing psychologist, performed a Mental Residual Functional Capacity Assessment.  Dr. Perlman concluded that Daniels could understand and remember simple instructions, sustain concentration for at least two hours, and complete simple one- and two-step tasks, as well as relate in a socially appropriate manner.  Daniels had displayed no extended episodes of decompensation.  Dr. Perlman concluded that Daniels had moderate difficulties in maintaining social functioning and concentration, persistence, or pace, but also noted that she can do a full range of daily activities with only mild restrictions.  On April 26, 2010, Dr. M. Bohnert, Ph.D., a DDS staff psychologist, concurred with Dr. Perlman's assessment.

## DISCUSSION

Judicial review is limited to determining whether the findings of the Commissioner are supported by substantial evidence.  *See* 42 U.S.C. § 405(g); *Manso–Pizarro v. Sec'y of Health and Human Servs.*, 76 F.3d 15, 16 (1st Cir. 1996). "Substantial evidence . . . means evidence reasonably sufficient to support a

conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence. . . . [T]he question [is] not which side [the court] believe[s] is right, but whether [the ALJ] had substantial evidentiary grounds for a reasonable decision . . . ." *Doyle v. Paul Revere Life Ins. Co.*, 144 F.3d 181, 184 (1st Cir. 1998). The Commissioner's findings, however, "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." *Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). The Act further provides that:

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

Disability determinations follow the "sequential step analysis" mandated by 20 C.F.R. § 404.1520. The analysis requires that the ALJ first determine whether a claimant was gainfully employed prior to the onset of the disabling condition. At the second step, the ALJ must determine whether a claimant suffers from a severe impairment limiting his ability to work. If the impairment is the same as, or equal in its effect to, an impairment (or combination of impairments) listed in Appendix 1 of the regulations, the claimant is presumptively deemed disabled. If the impairment is not covered by Appendix 1, the fourth step of the analysis requires that the claimant prove that her disability is sufficiently serious to preclude a return to her former occupation. If she meets that burden, the Commissioner at the fifth step is obligated to prove that there are other jobs in the national economy that the claimant is able to perform. *Gonzalez Perez v. Sec'y of HEW*, 572 F.2d 886, 888 (1st Cir. 1978) ("[A] claimant must establish that he can no longer perform his prior vocation before the government is obligated to prove that alternative employment is available for a person in claimant's condition.").

In applying the sequential analysis, the ALJ first determined that Daniels had not engaged in substantial gainful activity since November 24, 2008, the alleged onset date. At the second step, she found that Daniels' combination of impairments causes her significant limitation in her ability to perform basic work activities and

thus qualifies as "severe" under 20 C.F.R. §§ 404.1520(c) and 416.920(c). However, at step three, the ALJ found that Daniels did not have a combination of impairments that meets or medically equals one of the impairments listed in Appendix 1. At step four, the ALJ found Daniels to have the Residual Functional Capacity (RFC) to perform light work, but with some limitations. At the final step, the ALJ determined Daniels to be unable to perform her previous work as a personal care assistant but nonetheless able to perform other jobs existing in significant numbers in the local and national economy.

Daniels' chief argument is that the ALJ erred as a matter of law when she "present[ed] the vocational expert [VE] with a hypothetical question that contained limitations that were materially less restrictive than those listed in [her] final decision." Pet'r Br. at 7. She claims that she is entitled to a new hearing to consider whether "additional limits" contained in the ALJ's RFC finding, but omitted from the ALJ's hypothetical question, would change the expert's conclusion that Daniels could perform work available in the local and national economy. *Id.* at 12.

Daniels is correct to point out that a material discrepancy between a hypothetical and the RFC could warrant a remand. *See Slovak v. Barnhart*, 2003 WL 21246049, at *7 (D.N.H. May 29, 2003) (remanding for further consideration where "the ALJ's hypothetical question contained a less-restrictive limitation on handling

than the limitation stated in the his findings of fact"); *see also Arocho v. Sec'y of Health and Human Servs.*, 670 F.2d 374, 375 (1st Cir. 1982) ("[I]n order for a vocational expert's answer to a hypothetical question to be relevant, the inputs into that hypothetical must correspond to conclusions that are supported by the outputs from the medical authorities."). Here, however, there is no such discrepancy.

The ALJ asked the VE to consider a hypothetical claimant who, inter alia, "should not be in damp, humid environments." Tr. 33. In the RFC, the ALJ limited Daniels to no more than "incidental exposure to damp/humid environments." Contrary to Daniels' suggestions, this discrepancy is immaterial because the universe of jobs identified by the VE in response to the hypothetical is smaller than the universe of jobs contemplated by the RFC. By definition, any person who could perform a "minimal exposure" job could also perform a job requiring "zero exposure." *See Poland v. Apfel*, 2000 WL 36950, at *14 n.19 (D.N.H. Dec. 22, 1999) ("If the VE believed that jobs existed in the national economy which could be performed by a person with the set of limitations identified in the hypothetical, then a person with a set of limitations less restrictive than that identified in the hypothetical – i.e., the set of limitations identified in the ALJ's final opinion—could perform those same jobs."). Indeed, the discrepancy between the hypothetical and the RFC, if anything, worked in Daniels' favor.

Daniels also argues that there is a discrepancy between the provision of the hypothetical that "[w]ork should not be performed at heights, using ladders, ropes, or scaffolding," on the one hand, and the provision of the RFC stating that Daniels' "would need to avoid more than incidental exposure to damp/humid environments, or work at heights, or using ladders, ropes, and scaffolding," on the other. Compare Tr. at 33 with Op. at 44. However, the RFC is fairly read as providing that Daniels should not work at heights or use ladders, ropes, and scaffolding at all – not, as Daniels suggests, that she should only avoid "incidental exposure" to them. *See* Comm'r Br. at 12. ("It is understandable how an individual might be able to tolerate limited exposure to a damp environment. However, if the individual's limitations pose a danger for work at heights, the danger would persist at any level of exposure."). In any event, the supposed discrepancy again inures to Daniels' benefit.

Finally, Daniels claims that the ALJ did not give due deference to the opinion of Catherine Gressler. Invoking the "treating physician rule," Daniels contends that the ALJ improperly chose to give greater weight to the opinions of other treating doctors and the state agency medical consultants and, in doing so, committed error.

Under the treating physician rule, the ALJ is directed to ordinarily give more weight to the opinion of a treating physician as to the nature and severity of an impairment "since these sources are likely to be the medical professionals most able

to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." *See* 20 C.F.R. § 404.1527(d)(2). That said, the ALJ is not required to give a treating physician's opinion *controlling* weight. *Arroyo v. Sec'y of Health and Human Servs.*, 932 F.2d 82, 89 (1st Cir. 1991); *Rodriguez Pagan v. Sec'y of Health and Human Servs.*, 819 F.2d 1, 4 (1st Cir. 1987). If the treating physician's opinion is inconsistent with other evidence in the record, the conflict is for the ALJ — and not the court — to resolve. *Rodriguez Pagan*, 647 F.2d at 222. Moreover, the opinion of a treating physician that a claimant is unable to work is entitled to no deference at all because as it is not a medical opinion. *Morales-Alejandra v. Med. Card. Sys., Inc.*, 486 F.3d 693, 700 n.7 (1st Cir. 2007).

The Commissioner argues that Gressler, as a Licensed Mental Health Counselor, is not an "acceptable medical source[]" whose opinion is entitled to more weight under the treating physician rule. *See* 20 C.F.R. §§ 404.1527(c)(2), 404.1502, 404.1513(a). Even assuming the Commissioner is mistaken in this regard, the ALJ's decision to discount Gressler's assessment regarding the severity of Daniels' impairments and the resulting limitation in her functioning is nonetheless supported by substantial evidence. While the ALJ noted the GAF score of 40 and the restrictive

assessment assigned by Gressler, she also noted that Gressler's opinion was based on only two contacts with Daniels, that it relied heavily on Daniels' own self-reporting, and that it was inconsistent with the overall objective medical evidence. The ALJ also found that Gressler's opinion was contradicted by Daniels' own testimony and treatment history. These indicated an ability to handle a wide range of daily activities and noncompliance with prescribed medications and treatment regimes, belying Daniels' allegation of total disability. On this record, it was well within the ALJ's province to assign greater weight to the opinions of Dr. Le, who had been Daniels' primary physician since at least 2007, and Dr. Perlman, whose assessment included a review of all of Daniels' available medical records.

ORDER

For the foregoing reasons, Daniels' motion to reverse the decision of the Commissioner is <u>DENIED</u>. The Commissioner's cross-motion to affirm is <u>ALLOWED</u>. The Clerk will enter judgment accordingly and close the case.

SO ORDERED.
/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE